891 A.2d 1134

**MAYOR AND CITY COUNCIL OF BALTIMORE**

v.

**Michael Lee HART.**

**No. 403, Sept.Term, 2005.**

Court of Special Appeals of Maryland.

Feb. 2, 2006.

Darrell Chambers (Ralph S. Tyler, City Solicitor on the brief), Baltimore, for Appellant.

Irwin E. Weiss (Morris E. Balser on the brief), Baltimore, for Appellee.

Panel: MURPHY, C.J., DAVIS and BARBERA, JJ.

DAVIS, Judge.

On August 20, 2003, Michael Lee Hart, appellee, filed a complaint in the Circuit Court for Baltimore City against the Mayor and City Council of Baltimore, appellant, and Allstate Insurance Company[1] for injuries suffered as a result of an accident on February 16, 2002, involving a Baltimore City police cruiser. On January 14, 2005, appellant filed a motion *in limine* to prevent appellee from introducing Baltimore Police Department General Order No. 11–90 (General Order 11–90). On March 2, 2005, following a hearing, the court denied appellant's motion.

The case proceeded to trial on March 30, 2005 (Themelis, J., presiding), where appellee was permitted to introduce evidence of General Order 11–90, over appellant's objection. On March 31, 2005, at the conclusion of the presentation of the evidence, the trial court included an instruction regarding General Order 11–90. The jury returned a verdict in favor of appellee, awarding damages in the amount of $46,894.05. The portion of the judgment entered against appellant is $20,000, representing the maximum recovery possible. The remainder of the judgment, $26,894.05 was entered against Allstate In-

---

1. Allstate was a named defendant in this action, in anticipation of a claim by the Mayor and City Council that it would not be liable beyond the $20,000 statutory maximum. After the Mayor and City Council and Allstate filed cross-claims, Chief Judge Kaplan, on March 2, 2005, signed an order in favor of the Mayor and City Council dismissing the City from any liability above the statutory maximum. Thereafter, Allstate did not participate in the trial and the jury, on March 31, 2005, awarded appellee a judgment against the Mayor and City Council for the statutory maximum and $26,894.05 against Allstate.

surance Company. Appellant appeals presenting two questions for our review.

1. Did the lower court err when instructing the jury by including an instruction based on Baltimore Police Department General Order 11–90?

2. Did the lower court err in denying [appellant's] motion *in limine* to preclude [appellee] from introducing evidence of Baltimore Police Department General Order 11–90?

## FACTUAL BACKGROUND

On February 16, 2002, appellee and Officer Mark V. Greff, a Baltimore City Police Officer, were involved in a motor vehicle collision at the intersection of Madison and Wolf Streets in Baltimore City. The intersection of Madison and Wolf Streets is controlled by a traffic signal. Appellee testified that, as he was headed westbound on Madison Street, he stopped for a traffic light at Madison Street and Washington Avenue; thereafter, appellee proceeded on Madison Street to the intersection of Madison and Wolf. Appellee stated that, as he approached the light at the intersection of Madison and Wolf Streets, it turned green for westbound vehicles. He proceeded through the intersection and, at that time, his van was struck by the police cruiser, driven by Officer Greff. Appellee's testimony was that he never heard a police siren. He also did not see any police lights prior to entering the intersection.

Three witnesses, other than appellee and Officer Greff, testified at the hearing. Gregory Ware was in a vehicle on Wolf Street, approximately a city block away from the accident, traveling in the same direction as the officer when he witnessed the accident. Ware testified that Officer Greff had the police lights on as he approached the intersection, but he only heard the siren intermittently, describing the sound as "the little boop, boop, boop." Ware's signed statement from the morning of the accident indicates that Officer Greff's lights and siren were activated. Ware testified that his statement

indicating that Officer Greff's siren was activated was incorrect. Ware then refused to authenticate the statement. He also stated that Officer Greff's brake lights were activated, but he did not see the Officer come to a complete stop at the intersection. Ware recalled that the traffic signal controlling the direction of the Officer was red.

At the time of the accident, Jerry Perkins was operating a vehicle directly behind appellee's vehicle on Madison Street. He confirmed that, as he and appellee approached the intersection, the traffic signal turned green. Perkins was driving with his windows slightly open. His testimony, consistent with that of other witnesses, was that the Officer's cruiser entered the intersection and struck appellee's van. Perkins did not recall seeing the police vehicle emergency lights flashing or hearing the siren prior to the accident; he testified, however, that he noticed the police lights were on after the accident and he could hear a faint siren. He was not able to state, with certainty, whether the lights were turned on prior to or following the accident.

Officer Charles Reickel, one of the officers assigned to investigate the accident, also testified at trial, principally to introduce the statement of Gregory Ware into evidence. Officer Reickel authenticated Ware's statement, testifying that he wrote the facts contained in the statement, but Ware then read and signed the statement. He further explained that, if Ware had indicated Officer Greff "chirped" his siren, it would have been entered that way on the report. The report as written, according to Officer Reickel, reflects that the siren was on continuously.

At the time of the accident, Officer Greff was responding to a police emergency, involving another officer struggling with a suspect on Monument Street. Officer Greff testified that he responded to the emergency with the lights and siren on. As he approached the intersection of Madison and Wolf Streets, he slowed his vehicle to clear the intersection, then proceeded through the intersection once it was cleared of vehicles. He stated that he proceeded through the intersection under the

impression, however mistakenly, that all vehicles including appellee's van had yielded to his vehicle. Officer Greff did not recall the color of the traffic signal as he approached the intersection, but testified that he was trained to slow down his vehicle at both green and red lights and clear the intersection because pedestrians do not always follow the traffic signals. When asked during direct examination if he was aware of General Order 11–90, Officer Greff stated that he was not aware of that specific General Order, but was aware that there are General Orders issued by the Commissioner. On cross-examination, Officer Greff was handed a copy of General Order 11–90, and was still not able to say whether he had ever seen it.

General Order 11–90 is titled "Departmental Emergency Vehicle Operation." It states the following, in pertinent part:

*POLICY*

Members of this Department shall operate departmental vehicles with utmost care and caution, comply with all traffic laws and SHALL NOT BECOME ENGAGED IN HIGH-SPEED PURSUIT DRIVING, except under EXIGENT circumstances. Exigent circumstances consist of:

Instances where the officer determines that immediate action is necessary; and

Insufficient time exists to resort to other alternatives; and

Failure to pursue may result in grave injury or death.

The Department recognizes it is better to allow a criminal to temporarily escape apprehension than to jeopardize the safety of citizens and its officers in a high speed pursuit.

*General*

The City of Baltimore is a highly congested urban area which necessitates driving a motor vehicles [sic] in a safe manner. In order for a departmental vehicle to be considered operating in an EMERGENCY MODE, BOTH ROOF MOUNTED EMERGENCY LIGHTS AND ELECTRIC SIREN MUST BE ACTIVATED. . . .

*RESPONSIBILITIES*

\* \* \*

4. When assigned as Primary and Secondary Units for dispatched calls and responding in an emergency mode:

 a. SLOW DOWN AT ALL INTERSECTIONS, ensure the intersection is safe to enter and then proceed cautiously.

 b. When crossing against any traffic control device, BRING YOUR VEHICLE TO A FULL STOP and ensure the intersection is safe to enter before proceeding.

 c. Ensure that your VEHICLE SPEED IS BOTH SAFE AND REASONABLE under the prevailing roadway and environmental conditions.

\* \* \*

*COMMUNICATION OF DIRECTIVE*

Commanding officers and supervisors shall communicate the contents of this directive to their subordinates and ensure compliance. This directive is effective on the date of publication.

On March 2, 2005, the court held a hearing on appellant's motion *in limine* to preclude evidence of General Order 11–90. Appellant, relying on *Richardson v. McGriff,* 361 Md. 437, 762 A.2d 48 (2000), argued that Baltimore Police Department General Order 11–90 is irrelevant, and use of the General Order would allow appellee to mislead the jury in its determination of whether the officer violated the relevant duty of care. Additionally, appellant argues that Md.Code (2002 Repl.Vol., 2005 Supp.), § 21–106(b)(2) entitled the officer to "[p]ass a red or stop signal, a stop sign, or a yield sign, but only after slowing down as necessary for safety," and the Baltimore City Police Commissioner cannot usurp that privilege.

In his response to appellant's motion, appellee argues that *McGriff, supra,* is distinguishable; insofar as *McGriff* was a police brutality case, where the Court of Appeals precluded the use of the guidelines because they were not relevant,

subject to interpretation, and required the officer to exercise his/her discretion. In the case *sub judice*, appellee contends General Order 11–90 is specific, the rules articulated therein do not require the exercise of discretion, and the rules are relevant to the facts of the case. Appellee also argued that the police Commissioner may adopt an enhanced duty of care, officers must follow those orders, and they are subject to sanctions for not following orders.

The court denied the motion *in limine*, stating, "there's nothing in the rules of the game that says when a statute is more general that a local jurisdiction can't make stricter rules. They can't make more liberal rules, but they can make stricter rules, and that's what they've done here and so the motion *in limine* is denied."

## LEGAL ANALYSIS

### I. MOTION *IN LIMINE*

We address appellant's claims of error out of order because, as we see it, we must first decide if the trial court erred in denying the motion *in limine*, in which appellant sought to preclude the admission of General Order 11–90.

The Code of Public Laws of Baltimore City vests in the Police Commissioner for Baltimore City (Commissioner) the authority to promulgate rules and regulations incident to the management of the department. Specifically, Code of Public Laws of Baltimore City § 16–7 reads:

In directing and supervising the operations and affairs of the Department, the Commissioner shall, subject to the provisions of this subtitle, . . ., be vested with all the powers, rights and privileges attending the responsibility of management, and may exercise the same, where appropriate, by rule, regulation, order or other departmental directive which shall be binding on all members of the Department when duly promulgated.

Section 16–7 continues:

The authority herein vested in the Police Commissioner shall specifically include, but not be limited to, the following:

\* \* \*

(8) To regulate attendance, conduct, training, discipline and procedure for all members of the Department and to make all other rules, regulations and orders as may be necessary for the good government of the Department and of its members.

Pursuant to the authority granted by section 16–7, the Commissioner issued General Order 11–90, which we have set forth, *supra*. Appellant argues that the rules are discretionary and, as such, are not laws and therefore, should not be admissible as evidence of its negligence. Relying principally on the Court of Appeals' decision in *Richardson v. McGriff*, 361 Md. 437, 762 A.2d 48 (2000), appellant asserts that the circumstances immediately preceding the accident are the only relevant information for the jury's consideration in deciding the reasonableness of Officer Greff's actions.

*McGriff* involved the Court's consideration of a claim of excessive force. 361 Md. at 444–45, 762 A.2d 48. The petitioner, Richardson, was one of a group of juveniles who broke into a vacant apartment at 9:00 in the evening. *Id.* at 441, 762 A.2d 48. One of the juveniles noticed the police outside the apartment and the group panicked causing Richardson and three of his friends to hide in a closet in the kitchen area. *Id.* at 442, 762 A.2d 48. Richardson carried with him, into the closet, a vacuum cleaner pipe, with which he previously had been playing. *Id.* The break-in was reported to the police and Officer McGriff received the call about 10:00. *Id.* He arrived at the scene, observing that a vacant apartment door was ajar and the apartment was dark. *Id.* After calling for backup, Officer Catterton arrived and the two began searching the apartments. *Id.* at 442–43, 762 A.2d 48. Significantly, when the call was made, the dispatcher included that shots had been fired at the apartment. *Id.* at 442, 762 A.2d 48.

The Officers began by searching an upstairs apartment, and then proceeded down to the terrace level to search the apartment in which Richardson was hiding. *Id.* at 442–43, 762 A.2d 48. The officers entered the darkened apartment, but did not

turn on the lights. *Id.* at 443, 762 A.2d 48. They proceeded to conduct a room-by-room search and, upon hearing a bump in the kitchen, entered that room. *Id.* at 443–44, 762 A.2d 48. The officers had announced their presence upon entering the apartment and their intention to open the closet door, prior to doing so. *Id.* Officer McGriff positioned himself, with the flashlight and his weapon drawn, where he could see in the closet once the door was opened. *Id.* at 444, 762 A.2d 48. Officer Catterton positioned himself out of the line of fire, where he could open the door. *Id.* Once the door was opened, Officer McGriff saw what he believed to be a weapon being lowered into the firing position and shot Richardson. *Id.*

Richardson filed claims for battery, gross negligence, and violation of his rights under Article 26 of the Maryland Declaration of Rights. *Id.* at 441, 762 A.2d 48. Officer McGriff defended, claiming he acted in self-defense, which brought into question the reasonableness of his use of deadly force. *Id.* at 440, 762 A.2d 48. The Court of Appeals explained that the common issue regarding all three of Richardson's claims required consideration of whether Officer McGriff acted reasonably when the closet door was opened and he saw what he believed to be an armed man about to fire at him. *Id.* at 445, 762 A.2d 48. To support his claims, Richardson sought the introduction of certain guidelines and regulations of the Baltimore City Police Department. *Id.* at 445, 762 A.2d 48. Officer McGriff filed a motion *in limine* seeking to exclude the admission of the guidelines, which the trial court granted on relevance grounds. *Id.* at 448, 762 A.2d 48.

The Court provided a description of the excluded police guidelines, stating:

> The documentary evidence sought to be excluded consisted of nine pages of single-spaced guidelines issued by the Baltimore City Police Department on the use of deadly force and 13 pages of single-spaced rules and regulations concerning a wide range of police conduct and behavior. Most of the rules and regulations, which cover the entire gamut of police conduct, from being courteous and fulfilling

financial obligations, to saluting superior officers, to refraining from publicly criticizing public officials, to the circumstances when gambling, drinking, and smoking is not permitted, have no discernible relevance to any issue in the case. Even the guidelines on the use of deadly force included standards dealing with matters wholly inapposite to this case—guidelines on shooting at vehicles, shooting from vehicles, killing dangerous animals, and chasing suspects.

The rules and regulation relating to firearms require police officers to be suitably armed when on duty and, although they place conditions on the use of firearms to prevent the escape of felons and prohibit their use to prevent the escape of misdemeanants, they expressly permit officers to use their firearms in self-defense. The guidelines dealing with deadly force that [Richardson] particularly stressed provide, in pertinent part, that officers may use deadly force "only as a last resort," they "should try to avoid putting themselves in the situation where they have no option but to use deadly force," that they should "[t]ry to use other less deadly means," and that they should "[w]ait for [a] sufficient number of officers to handle situation[s] without undue force." Consistent with the rules and regulations, the guidelines expressly allow the use of firearms in self-defense and state that "[t]he attacked officer is the person who has to evaluate the potential seriousness of the attack and determine an appropriate level of response," the only caveat being that "[t]he evaluation and response must be reasonable from the perspective of a reasonable police officer similarly situated."

*McGriff,* 361 Md. at 446–47, 762 A.2d 48.

The Court of Appeals, in *McGriff,* adopted the holding of the Supreme Court in *Graham v. Connor,* 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989), and explained that:

[T]he Supreme Court held "that an 'excessive force' claim against police officers under 42 U.S.C. § 1983 is to be judged under Fourth Amendment jurisprudence, rather than under notions of substantive due process. The inquiry thus focuses on the objective reasonableness of the officer's

conduct. Because, the [Supreme] Court held, the test of reasonableness 'is not capable of precise definition or mechanical application,' its proper application 'requires careful attention to the facts and circumstances of each particular case.' "

*McGriff,* 361 Md. at 452, 762 A.2d 48 (citing *Connor,* 490 U.S. at 396, 109 S.Ct. at 1872, quoting in part from *Bell v. Wolfish,* 441 U.S. 520, 559, 99 S.Ct. 1861, 1884, 60 L.Ed.2d 447 (1979)). "The 'reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. . . ." *Id.* (citing *Connor,* 490 U.S. at 396–97, 109 S.Ct. at 1872). The question, the Court stated, is "one of permissible focus: is the jury limited to considering only the circumstances contemporaneous with the 'seizure'—what immediately faced McGriff when the closet was opened—or was it entitled to consider as well the reasonableness of the officer's antecedent conduct?" *Id.* at 452, 762 A.2d 48.

The Court concluded that the reasonableness of an officer's use of deadly force should be determined by examining the circumstances at the moment or moments directly preceding the use of deadly force. *McGriff,* 361 Md. at 458, 762 A.2d 48. In demonstrating that Police Guidelines simply did not support petitioner's theory of the case, Judge Wilner, writing for the majority, reasoned:

Noting the statement that deadly force should be used only as a last resort, petitioner urged that he be permitted to elicit from McGriff his acceptance of that proposition and "that he doesn't just go in, like a cowboy, and shoot first and ask questions later." There was, of course, *no* evidence that McGriff did any such thing. Petitioner also said that he wanted to cross-examine McGriff about the admonition to "wait for a sufficient number of officers to handle situations without undue force." At no time during the hearing, however, did petitioner suggest that he was prepared to offer any evidence (1) that additional back-up was immediately available, (2) how much back-up would have been reasonable in light of the officers' previous experience and

what they had been told was the situation, (3) whether, given the prospect of there being a victim in the building, it would have been reasonable for the two officers to wait, or (4) how the situation in the kitchen would have played out any differently if additional officers had joined the search of the house. *The court granted the motion on relevance grounds, noting that there were no allegations in the complaint that the suit was based on a violation of any police orders, regulations, or guidelines.*

Petitioner does not really suggest otherwise. *None of the actions pled, and certainly none that were submitted to the jury, were based on the violation of any orders, regulations, or guidelines.* Instead, at least as the argument unfolded in this Court, petitioner was seeking to use this material only as a basis for claiming that Officers McGriff and Catterton should not have entered the apartment in the first place, without some undefined additional back-up, or, once there, they should have turned on the kitchen lights. The excluded evidence was thus relevant, if at all, only in those regards.

*Id.* at 448, 762 A.2d 48.

The Court ultimately determined, with respect to the issue of relevance:

The Jury might, perhaps, question the immediate decision by Officer McGriff to fire his gun when the closet door was opened, but it would have been sheer hindsight speculation to find that it was unreasonable, by reason of any police guideline or regulation cited by [Richardson], for the two officers to enter the building and search it. On this record, the admonition in the guidelines to '[w]ait for [a] sufficient number of officers to handle situation[s] without undue force'... had utterly no relevance; nor, through an expansive jury instruction, could the jury be allowed to speculate that Officers McGriff and Catterton should not have entered the building.

*Id.* at 458, 762 A.2d 48.

■ Preliminarily, we note that the instant case does not involve any allegation of excessive force by a police officer and,

therefore, does not require an analysis of Officer Greff's conduct under the Fourth Amendment jurisprudence announced by the United States Supreme Court in *Connor, supra.* Appellee has not made any claims that he was seized in violation of either his Fourth Amendment rights under the United States Constitution, or his rights under Article 26 of the Maryland Declaration of Rights. On that factual basis alone, *McGriff* is inapposite to appellant's position, insofar as appellee filed claims for simple negligence on the part of appellant. The Court's decision, in *McGriff,* was specific to claims involving use of force by a police officer, where the antecedent conduct of an officer, prior to the moment of seizure, is not appropriate for consideration, because that would amount to hindsight speculation.

The Court, in rejecting respondent's position, determined that the guidelines offered by Richardson were broad, encompassing police conduct and behavior, which was not at all relevant to the issues. *McGriff,* 361 Md. at 446, 762 A.2d 48. That cannot be said of General Order 11–90, which covers Departmental Emergency Vehicle Operation. Additionally, the guidelines in *McGriff* were indeed discretionary, *see Id.* at 447, 762 A.2d 48, *supra,* providing "the attacked officer is the person who has to evaluate the potential seriousness of the attack and determine an appropriate level of response." The specific sections of General Order 11–90 to which we alluded, *supra,* leave little, if any discretion to the officer operating an emergency vehicle.

Moreover, the Court in *McGriff* did not announce a *per se* rule excluding police department guidelines from consideration in all circumstances. The Court held that the guidelines at issue in *McGriff* were not admissible on relevance grounds, in that use of the guidelines would have permitted the jury to evaluate the reasonableness of the officer's antecedent conduct—the decision to enter the building, the decision to leave the lights off, and the decision not to wait for more officers—none of which is proper for consideration in evaluating the officer's conduct in the context of an excessive force claim. In this case, the use of General Order 11–90 did not permit the

jury to evaluate, in hindsight, uncorrectable events or decisions made by Officer Greff, but rather to evaluate the reasonableness of the immediate decision to enter the intersection, against the traffic light, without bringing his vehicle to a complete stop.

As Judge Harrell stated in *McGriff,* the Court of Appeals "has considered police procedures and guidelines in determining whether police activity was reasonable under given circumstances." *McGriff,* 361 Md. at 504, 762 A.2d 48 (Harrell, J., dissenting). *See Williams v. Mayor & City Council of Baltimore,* 359 Md. 101, 753 A.2d 41 (2000)(Determining, in a simple negligence action, whether the police officer violated Article 27, Section 798 and Baltimore City Police Department General Order 10–93); *State v. Albrecht,* 336 Md. 475, 502–05, 649 A.2d 336 (1994)(holding the evidence supported the police officer's failure to follow the directives in the Montgomery County police department's Field Operations Manual); *see also Boyer v. State,* 323 Md. 558, 590–91, 594 A.2d 121 (1991)(Providing guidance to the trial court pertaining to a breach of duty by a police officer in a negligence action; the Court explained "[v]ery often when a breach of the police officer's duty is found in high speed chase cases like the present, there are particular aggravating circumstances, such as a violation of police department policies or guidelines"...); *Wise v. State,* 132 Md.App. 127, 136, 751 A.2d 24 (2000)(In a prosecution for drug possession, the defendant introduced the police department's failure to follow a General Order requiring officers to submit narcotics evidence for fingerprinting.); *Beca v. Mayor and City Council of Baltimore,* 279 Md. 177, 182–84, 367 A.2d 478 (1977)(holding that a police department General Order created an employment contract entitling appellant to reimbursement for expenses paid to an employee for injuries caused by a third party).

In *State v. Pagotto,* 361 Md. 528, 762 A.2d 97 (2000), decided the day after *McGriff,* the Court held there was insufficient evidence to support the conviction of a police officer for involuntary manslaughter and reckless endangerment in the shooting death of a suspect attempting to flee. *Id.* at 556, 762

A.2d 97. The State argued Pagotto was grossly negligent for violating Baltimore City Police Department guidelines in three respects: 1) Closing on the victim with his gun drawn; 2) attempting a one-armed vehicular extrication with his gun in the other hand; and 3) placing his trigger finger on the slide of the gun, rather than under the trigger guard as he approached the decedent's car. *Id.* at 538–39, 762 A.2d 97. The Court determined that Pagotto's conduct did not rise to the level of "wanton or reckless disregard for human life." *Id.* at 553, 762 A.2d 97. The Court explained:

> In hindsight, perhaps Sergeant Pagotto should have acted differently on the night of February 7, 1996. His actions 'in circumstances that are tense, uncertain, and rapidly evolving' may even amount to ordinary civil negligence, but they are not such a gross deviation from the actions of an ordinary police officer similarly situated so as to evidence the 'wanton or reckless disregard for human life' necessary to support a conviction in this case.

*Id.* at 555–56, 762 A.2d 97.

Our decision on this issue is supported by the authority referenced, *supra.* We hold that the trial court did not err in admitting General Order 11–90. There is no general prohibition against the introduction or use of police department regulations or guidelines, notwithstanding the Court of Appeals' decision in *McGriff*, as we have explained, *supra.* The guidelines, offered by appellee in this case, are particularly relevant to the reasonableness of Officer Greff's conduct in proceeding through the intersection against the traffic control signal. The statute makes it clear that the Commissioner is vested with the authority to promulgate rules and regulations incident to the management of the department. Pursuant to that authority, General Order 11–90 was issued, and the General Order, without question is binding on all members of the Department. The General Order, requiring officers to bring their vehicles to a complete stop before crossing against a traffic control signal, involves no use of discretion. We agree with Chief Judge Bell's statement in *Pagotto* that "a violation of a police guideline is not negligence per se, it is,

[however], a factor to be considered in determining the reasonableness of police conduct." 361 Md. at 557, 762 A.2d 97 (Bell, C.J., dissenting).

## II. JURY INSTRUCTIONS

Appellant next contends that the trial court erred when instructing the jury by submitting for its consideration Baltimore Police Department General Order 11–90. Appellant's contention rests upon the argument that the purpose of jury instructions is to inform the jury on the law that applies to the evidence presented. It argues that general orders are guidelines and not laws and, therefore, it was error for the trial court to include an instruction based upon General Order 11–90.[2]

---

**2.** At oral argument in this Court, appellant's counsel acknowledged that the principal thrust of the appeal by the Mayor and City Council was the admission of the General Order into evidence by the trial judge. Once the Order was admitted, appellant was faced with a Hobson's choice, *i.e.*, strenuously object to an instruction in which the trial judge admittedly took pains to explain to the jury that the General Order does not occupy the status of a statute or law, but is merely one of many factors to be considered. Analogous would be the admission of evidence of the standard of care in a medical malpractice case, which is clearly evidence that may be considered by the fact finder, although not inked in any code or set of regulations. The alternative to registering a strong objection to the instruction was to take advantage of the benefit of the court's relegation of the Order to something with less legal force than a law or duly enacted regulation.

During closing argument, [appellee's] counsel remarked to the jury, Officer Greff "violated the rules his boss told him to follow." He further commented that the Officer had never read the General Order and did not know it existed. [Appellant's] counsel responded, the "judge has already instructed you that [General Order 11–90] is not the law." In rebuttal, [appellee's] counsel states "the General Order which was just thrown in the trash [by appellant's counsel] says they're supposed to follow those rules." [Appellee's] final comment to the jury regarding the General Order was "[t]he position of the Mayor and City Council is if you flick on your lights and your siren you can go through an intersection any time you want because look, everybody else is supposed to yield the right of way. That's not what the general order says, and that's not what this statute [referring to the Transportation Code, § 21–405] says." Neither the circuit court nor counsel ever suggested to the jury that the general order established that Officer Greff was negligent *per se*.

Preliminarily, we must address appellee's claim that this issue was not preserved for appeal. Md. Rule 2–520(e) states that "no party may assign as error the giving or the failure to give an instruction unless the party objects on the record promptly after the court instructs the jury, stating distinctly the matter to which the party objects and the grounds of the objection." Appellee specifically argues that appellant, for the first time on appeal, makes two specific claims of error with respect to the court's jury instructions. Appellant alleges that the trial court instructed the jury, pursuant to General Order 11–90, that Officer Greff was bound to act in a certain way, by stopping before entering the intersection where the accident occurred. Appellant also asserts that it was error for the trial court to instruct the jury that it could use the General Order to determine whether the officer acted reasonably.

The rationale of Rule 2–520(e) was explained in *Hoffman v. Stamper*, 385 Md. 1, 40, 867 A.2d 276 (2005). The purpose of the Rule, ..., is "to enable the trial court to correct any inadvertent error or omission in the oral [or written] charge, as well as to limit the review on appeal to those errors which are brought to the trial court's attention." *Id.* (citing *Fisher v. Balto. Transit Co.*, 184 Md. 399, 402, 41 A.2d 297 (1945) (alteration in original)). "In that manner, 'the trial judge is afforded an opportunity to amend or supplement his charge if he deems an amendment necessary.'" *Id.* (citing *Sergeant Co. v. Pickett*, 283 Md. 284, 288, 388 A.2d 543 (1978)(quoting in part from *State v. Wooleyhan Transport Co.*, 192 Md. 686, 689–90, 65 A.2d 321 (1949) (Internal quotation marks omitted))). "Although we have often said that objections must be precise, the purpose of precision is 'that the trial court has no opportunity to correct or amplify the instructions for the benefit of the jury if the judge is not informed of the exact nature and grounds of the objection.'" *Id.* (quoting *Fearnow v. C & P Telephone*, 342 Md. 363, 378, 676 A.2d 65 (1996)).

Appellant's objection on the record was as follows:

[Appellant's Counsel:] (Inaudible) have an exception to the general order instruction discussion.

THE COURT: Okay. Well, what part of what I said—

[Appellant's Counsel:] Just—

THE COURT:—generally?

[Appellant's Counsel:]—based on my motion *in limine* and my objection (inaudible).

THE COURT: Okay. You probably have to do that to preserve the motion *in limine.* Any other exceptions?

[Appellant's Counsel:] No.

Appellant, in accordance with the Rule, objected on the record, following the giving of the instructions by the court, stating that it objected to the "general order instruction discussion." The record reflects the grounds for appellant's objection are the same grounds it relied upon in its motion *in limine* and a previous objection made on the first day of trial. The previous objection appellant referred to was actually a renewal of its objection to the admissibility of General Order 11–90. The colloquy between the court and counsel, at that time, was as follows:

[Appellee's Counsel:] Your Honor, at this point we'd like to introduce [appellee's] Exhibit 24. That's the stipulation as to its authenticity. That's the general order 11–90 of the Baltimore City Police Department.

[Appellant's Counsel:] Your Honor, can we approach on that?

THE COURT: Yes, uh-huh.

* * *

[Appellant's Counsel:] (Inaudible) that this is authentic. I still object to this coming in as evidence for the sake of— of course we had a motion *in limine* before Judge—

[Appellee's Counsel:] Kaplan.

[Appellant's Counsel:]—Kaplan and he let it in, but I want to put on the record that I object to this coming in.

THE COURT: Okay. How come Kaplan started the case and I'll end up with it?

[Appellee's Counsel:] We had a hearing on a motion for a partial summary judgment to be filed. By that time they had filed a motion *in limine*, and Judge Kaplan went ahead and ruled on the motion *in limine*.

\* \* \*

THE COURT: Uh-huh. Okay. That's the law of the case, then, but your renewal of that motion is denied because Judge Kaplan has already ruled on it.

\* \* \*

THE COURT: Okay. It'll [sic] be marked in as Plaintiff's 24.

█ The objection made at the time the jury was instructed lacks the necessary precision to preserve the issue for appeal. The purpose underlying the requirement that objections be precise is to afford the trial court an opportunity to amend the instruction, which is not possible unless the objection is specific. *C & P Telephone, supra.* Appellant failed to inform the trial court of the two specific grounds it has raised for the first time on this appeal, making it impossible for the trial court to address those two issues. Additionally, it is clear that the trial court believed the objection to be an effort on the part of appellant to preserve the issue in the motion *in limine* for appeal. This, however, was also incorrect because, in order to preserve a ruling on a motion *in limine* which seeks to preclude the admission of evidence at trial, the party challenging the admission must object at the time the evidence is offered to preserve the issue for appeal. *See Reed v. State,* 353 Md. 628, 643, 728 A.2d 195 (1999).

Appellant's previous objection to the admissibility of General Order 11–90, during trial, also lacked the necessary specificity to inform the trial court of the nature and grounds of its objection to the jury instruction. It is obvious from the exchange that, at the time General Order 11–90 was offered

for admission at trial, the trial court was completely unaware that there had been a hearing and ruling on its admissibility. Appellant's objection, at that point, failed to provide the trial court with any additional information regarding the grounds it argued at the motions hearing. For appellant to simply state to the trial court, when objecting to the jury instructions, that it is relying on the motion *in limine*, knowing that the trial judge is not the judge who ruled on the motion, without more, rendered the objection insufficient. It was incumbent on appellant to make certain the court was fully informed. Suffice it to say that neither the objection lodged by appellant at the time General Order 11–90 was offered into evidence, nor the objection to the jury instruction, relying on the grounds relied upon in the motion *in limine*, sufficiently informed the court of the grounds for the objection to the jury instruction to preserve the issue for appeal. Appellant had at least two opportunities to inform the court of the specific grounds upon which it objected and failed to do so. Therefore, we hold that the issues raised by appellant for the first time on this appeal, concerning the court's instructions to the jury, were not properly preserved for appellate review.

▮ Were the issues appellant raises regarding the court's instructions to the jury preserved, we would nevertheless conclude that they are without merit. Md. Rules 2–520(c) and (d) provide, in pertinent part:

(c) *How given.* The court may instruct the jury, orally or in writing or both by granting requested instructions, by giving instruction of its own, or by combining any of these methods. The court need not grant a requested instruction if the matter is fairly covered by instructions actually given.

(d) *Reference to evidence.* In instructing the jury, the court may refer to or summarize the evidence in order to present clearly the issues to be decided. In the event, the court shall instruct the jury that it is the sole judge of the facts, the weight of the evidence, and the credibility of the witness.

 We have said that "a trial court must properly instruct a jury on a point of law that is supported by some evidence in the record." *Boone v. American Manufacturers Mutual Insurance Company*, 150 Md.App. 201, 225, 819 A.2d 1099 (2003). A party is generally entitled to present his/her theory of the case through a requested instruction when there is evidence before the jury to support the theory. *Id.* at 226, 819 A.2d 1099 (citing *Robertson v. State*, 112 Md.App. 366, 375, 685 A.2d 805 (1996)). In *University of Maryland Medical System Corp. v. Malory*, 143 Md.App. 327, 795 A.2d 107 (2001), enunciating the standard of review, we said:

> In order to determine whether the instructions, as provided by the trial court, rise to the level of commanding reversal of the jury verdict, we must look to the underlying objective of jury instructions. We have previously stated that '[t]he purpose of jury instructions is to aid the jury in clearly understanding the case and ... to provide guidance for the jury's deliberations by directing [its] attention to the legal principles that apply to and govern the facts in the case; and to ensure that the jury is informed of the law so that it can arrive at a fair and just verdict.'

*Id.* at 337, 795 A.2d 107, *cert. denied,* 368 Md. 527, 796 A.2d 696 (2002). "The test for whether an instruction was proper has two aspects: (1) whether the instruction correctly states the law, and (2) whether the law is applicable in light of the evidence before the jury." *Johnson v. State*, 303 Md. 487, 512, 495 A.2d 1 (1985), *cert. denied,* 474 U.S. 1093, 106 S.Ct. 868, 88 L.Ed.2d 907 (1986) (citing *Sergeant Co. v. Pickett*, 285 Md. 186, 194, 401 A.2d 651 (1979)).

We have previously held, *supra,* that the trial court did not err in denying appellant's motion *in limine.* Therefore, General Order 11–90 was properly admitted at trial as evidence of whether or not Officer Greff was acting reasonably in the operation of the Baltimore City Police cruiser. Because we have decided that the evidence was admissible, and the evidence was before the jury, appellee was entitled to an instruction concerning General Order 11–90, and the court was required to provide an instruction to aid the jury's under-

standing of the proper context for considering that piece of evidence.

In that regard, the court instructed the jury as follows:

Now, you heard reference to general orders. Now, a general order by the police department is an order adopted or issued by the police commissioner setting up standards for what the police commissioner expects to be done in certain situations, and there are general orders that cover the complete gambit of what an officer should do or not do in a given situation.

In this case there was a police department general order dated November 7th, 1990 which covered the operation of an emergency vehicle. No, this is not a statute. This is a general order which binds the police to act in a certain way. It's like—it's called—well, it says it's a general order. It's just as if the commissioner had told his officers this is what I want you to do.

It is not a statute, however. Violation of a statute that is a cause of the injury is evidence of negligence. What you can consider this general order for is in light of the general order do you find that—the officer's conduct, if you find that it was contrary to the general order, was that a cause of the accident.

It's a little different from the violation of a statute because the statute does not require the vehicle to stop, you see. The general order clearly says that if you are operating your police vehicle in or under an emergency situation that you must use both sirens and lights, they must be activated, and that you may pass a red signal but only after stopping to insure the safe passage of other vehicles.

In other words, what the police commissioner did is he—and the reason I'm saying he, because we haven't had a female police commissioner yet, although we should have, but they've all been males. What he had done in 1990 is he increased the standard and it said when operating an emergency vehicle when crossing against any traffic control

device the driver must bring the vehicle to a full stop and insure the intersection is safe to enter before proceeding. You may use that order in determining whether or not the officer acted reasonably under those situations, but it in and of itself is not evidence of negligence. Evidence of—I'll get it out. Violation of a statute which is a cause of the accident is evidence of negligence.

This isn't a statute. This is a general order by a commanding officer and the police commissioner signs all these so it's coming from the top. And it's a statement by the commissioner saying that we put public safety above responding to an emergency, and I'm going to make sure that you activate both your lights and your sirens and that you stop, albeit a full stop, and it doesn't say how long you got to stop but it did say a full stop, to insure that—the safety of other vehicles on the roadway.

So you can consider this with regard to whether or not the officer was operating his vehicle in a reasonable manner on that date in light of the general order, even though he said he didn't know it.

The court's instructions properly explain what a police department general order is, and the purpose it serves. The court then described what is contained in the general order, which was admitted into evidence in the case. The court did not misstate any of the language contained in General Order 11–90 and, in any event, the jury was able to read the language of the order as part of the evidence during its deliberations. The court correctly stated that a General Order issued by the Commissioner is binding upon the members of the Department. We previously discussed the Code of Public Laws of Baltimore City § 16–7, which vests, in the Commissioner, the authority to promulgate regulations binding upon all members of the department. *See also Beca v. Mayor and City Counsel of Baltimore,* 279 Md. 177, 182, 367 A.2d 478 (1977) ("As heretofore indicated, the legislature has invested the Police Commissioner with broad powers to manage the Department, and has provided by § 16–7 that rules or orders lawfully promulgated by him 'shall be binding on all

members of the Department.' "). The court also instructed the jury on the scope of its consideration of General Order 11–90. The court stated, "[y]ou may use that order in determining whether or not the officer acted reasonably under those situations, but it in and of itself is not evidence of negligence."

We perceive no error in the trial court's statement of the law with respect to General Order 11–90. The court did present a summary of the General Order and, in that regard, was required to instruct the jury that it was the sole judge of the facts, the weight of the evidence and the credibility of the witnesses. The trial court instructed the jury on those issues on at least two occasions, once prior to trial and again at the conclusion of the trial. Reviewing the court's instruction against the standard of review we reiterated in *Malory, supra,* we perceive no reversible error. The court's instruction with respect to General Order 11–90 is designed to aid the jury in clearly understanding what a general order is and how it is to consider it. The court directed the jury's attention to the legal principles that apply and govern the facts of the case, *i.e.,* that a general order is not a statute, but it may be considered in determining if the officer acted reasonably. We hold, therefore, that the trial court did not err in instructing the jury with respect to General Order 11–90.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY AFFIRMED.**

**COSTS TO BE PAID BY THE MAYOR AND CITY COUNCIL OF BALTIMORE.**